FORTNER *v.* KOCH.

1. EVIDENCE—JUDICIAL NOTICE—POPULATION OF DETROIT.
   The Supreme Court takes judicial notice of the fact that the city of Detroit contains more than a million inhabitants.

2. STATUTES—PRESUMPTIONS—CONSTITUTIONAL LAW.
   Acts of the legislature are presumed to be valid and constitutional in the absence of a showing to the contrary.

3. CONSTITUTIONAL LAW—STATUTES—JURY TRIAL—VICINAGE.
   Statute authorizing trial of civil transitory actions between parties, one of whom is a resident of a city having more than a million inhabitants, before jury selected from residents of such city rather than from residents of whole county in which such city is located *held,* not unconstitutional as a denial of due process or equal protection of law (Act No. 24, Pub. Acts 1933).

4. EVIDENCE—MORTALITY TABLES—EXPECTANCY OF LIFE.
   Expectancy of life referred to in mortality tables is based upon the lives of healthy persons who are of the ages indicated.

5. APPEAL AND ERROR—CURING ERROR—IMPROPER ADMISSION OF MORTALITY TABLES IN EVIDENCE—REMITTITUR.
   The improper admission in evidence of mortality tables in action for malpractice by plaintiff who was in ill health from time defendant physician was first called in attendance and until other physicians took charge of the case *held,* cured by reduction of verdict from $25,000 to $7,000.

6. Damages—Improper Admission of Mortality Tables.

The improper admission in evidence of mortality tables in action for malpractice by one in ill health during period in controversy *held*, to have only affected the amount of the verdict.

7. Physicians and Surgeons—Intervals Between Visits to Patient—Negligence—Discretion of Physician.

A physician is not chargeable with neglect in allowing intervals to elapse between his visits where the patient needs no attention during the intervals but he is negligent in doing so where the attention is needed, frequency of visits being a question for the physician to determine if he uses ordinary judgment.

8. Same—Duration of Relation with Patient.

When a physician takes charge of a case and is employed to attend a patient, the relation of physician and patient continues until ended by mutual consent of the parties, or revoked by dismissal of the physician or the physician determines his services are no longer beneficial to the patient and then only upon giving the patient a reasonable time to procure other medical attendance.

9. Malpractice—Abandonment—Question for Jury—Instructions.

In action for malpractice, question as to abandonment of patient by defendant *held*, under record presented, to have been properly submitted as a question for the jury under instructions free from error.

10. Same—Diagnosis—Negligence.

In action for malpractice against physician who examined plaintiff manually, took his history, placed him on a diet for a week and then injected a solution into his blood stream, defendant *held*, liable for damages due to negligence where record shows that at the time of the examination made plaintiff had symptoms which would lead a physician to suspect cancer, syphilis, simple tumor, abscess or tuberculosis and usual practice in the community required not only taking the history and making manual examination but also to have an X-ray made, a blood test taken and a biopsy made in order to arrive at the proper conclusion and prescribe the correct treatment.

11. PHYSICIANS AND SURGEONS—SKILL REQUIRED.

A physician or surgeon is bound to follow the usual and ordinary practice of physicians and surgeons of ordinary learning, judgment or skill in his own or similar localities.

12. SAME—DIAGNOSIS.

A patient treated by a physician is entitled to a thorough and careful examination such as the condition of the patient and attending circumstances will permit with such diligence and methods of diagnosis for discovering the nature of the ailment as are usually approved and practiced by medical men of ordinary or average learning, judgment and skill in that community or similar localities.

13. SAME—EXPERIMENT—CONSENT—DIAGNOSIS—SPECIALISTS.

Experiments by physicians and surgeons upon patients must be done only with the knowledge and consent of the patient or those responsible for him and must not vary too radically from the accepted method of procedure, and, so far as diagnosing a case is concerned, the above rule applies to one who claims to be a specialist.

14. APPEAL AND ERROR—MALPRACTICE—INSTRUCTIONS—ERRONEOUS ASSUMPTION OF FACTS—CURING ERROR—REMITTITUR.

Instruction in malpractice case which assumed that defendant might be found to have injected a poisonous or harmful drug into plaintiff's blood stream *held*, prejudicial and constituted such reversible error as not to be cured by remittitur of $18,000 from $25,000 verdict, where record fails to disclose any testimony to the effect that the injection made was either poisonous or harmful.

Appeal from Wayne; Callendar (Sherman D.), J., presiding. Submitted April 5, 1935. (Docket No. 76, Calendar No. 38,315.) Decided June 3, 1935.

Case by Albert Fortner against Drs. William F. Koch and John W. Stiers for malpractice. From verdict and judgment for plaintiff against defendant Koch only, he appeals. Reversed, and new trial granted.

*Neal Fitzgerald,* for plaintiff.

*Goodenough, Voorhies, Long & Ryan,* for defendant.

EDWARD M. SHARPE, J.    Plaintiff, Alfred Fortner, is a man 64 years old.    For many years he worked as a switch tender and, prior to the injury complained of, was earning $210 per month.   He first became acquainted with Dr. Koch, defendant herein, during the year 1925 when he treated plaintiff for stomach ulcers.   In the spring of 1930, plaintiff began to have trouble with his left knee, due to a swelling which resulted in some loss of work.   He applied so-called home remedies, consulted a railroad physician, and finally consulted Dr. Koch on June 22, 1931.   At this time, the swelling caused the knee to be about one-third larger than its normal size.   At this consultation, Dr. Koch examined plaintiff's knee, stomach, liver and groin and informed him that he was suffering from a sarcoma (cancer); that he would have to go on a diet for a week and then return for treatment.   On June 29, 1931, plaintiff returned and was given an antitoxin injection. Three or four days after the injection, the skin over the swelling broke open and the sore raised up in a cauliflower mass and fluid began seeping out through the edges resulting in plaintiff suffering sharp pains and inability to sleep.

The only treatment given by Dr. Koch was to dress the sore with sterile gauze bandages and to apply boric acid, pheno isolin, together with morphine to relieve the pain.   Pus began to come out in greater quantities and by September 24th, which was the last date on which plaintiff received any treatment from defendant, the sore had greatly enlarged. On October 4th, Dr. Fleming was called in and plain-

tiff was advised to go to a hospital for diagnosis. He was there two days during which time the physicians obtained X-ray pictures of plaintiff's leg, a Wasserman test of his blood, and microscopically examined a section of the infected area. The microscopic examination disclosed that the tissue was free from cancer formation; the X-ray showed the bone free from disease; and the Wasserman test, being strongly positive, indicated that plaintiff was suffering from syphilis and that the open sore on plaintiff's knee was a gumma encountered in the last stage of syphilis. Plaintiff was then treated for syphilis and immediately began to show marked improvement. On March 15, 1932, he returned to work.

Plaintiff began suit against the defendant in April, 1933, upon the theory that the defendant was negligent in his diagnosis and treatment of plaintiff in the following particulars, *i. e.,* that he:

(a) Negligently failed to exercise a reasonable degree of care and skill as is usually exercised by physicians and surgeons practicing in this and like localities.

(b) And did not take proper X-rays for the purpose of making the proper diagnosis of the infected bone area.

(c) And did not take specimens of the tissue of the infected area and microscopically examine the same to determine the cause of said trouble.

(d) And did inject poisons or harmful drugs into the blood stream of the plaintiff.

(e) And did abandon the treatment of plaintiff without any cause whatsoever.

That by reason of the defendant's negligence plaintiff has already suffered intense and excruciating pain, and he will continue to suffer permanently; that plaintiff's left leg, because of the negligence of

the defendant, has been permanently injured and crippled and will be stiff for the rest of his life.

The cause was tried in June, 1934, and the jury rendered a verdict in favor of plaintiff for $25,000.

Defendant made a motion for a new trial, and the trial court, being of the opinion that the verdict was excessive by the sum of $18,000, ordered a new trial unless plaintiff remitted that amount of the verdict. Such remission was made and judgment for $7,000 was entered. Defendant appeals.

Defendant contends that it was error to permit the cause to be tried by a jury of the recorder's court of the city of Detroit under the provisions of Act No. 24, Pub. Acts 1933; that the trial court erred in permitting the introduction of mortality tables on the question of impaired earning capacity because plaintiff does not belong to that class of persons whose lives form the basis of mortality tables; that the court erred in permitting the jury to find defendant liable on the ground of abandonment; that the court erred in permitting the jury to find defendant liable in damages for failure to make certain tests for the purpose of a proper diagnosis; that it was error for the trial court to charge the jury that there was some testimony tending to support the allegations of the declaration that defendant did inject poisonous and harmful drugs into the blood stream of the plaintiff.

We have not listed all of defendant's assignments of error for the reason that the cause must be remanded for a new trial and we shall limit ourselves to a discussion of those alleged errors that may arise upon a new trial.

Act No. 24, Pub. Acts 1933, permits juries to be drawn for trials of civil cases from the regular panel of the recorder's court, whose membership is limited

to residents of the city of Detroit, whereas circuit court juries are drawn from Wayne county which includes the city of Detroit. This court takes judicial notice of the fact that the city of Detroit contains more than a million inhabitants. We fail to see where the defendant would have been afforded greater security or wider latitude by the opportunity of obtaining a jury from the county rather than from the city. The acts of the legislature are presumed to be valid and constitutional in the absence of a showing to the contrary. No such showing has been made in the instant case.

The next assignment of error we have listed pertains to the introduction in evidence of the mortality tables. In this cause it appears, and there can be no question about it, that plaintiff was in ill health from the time that defendant was called to attend plaintiff and until other physicians took charge of the case. In *Denman* v. *Johnston,* 85 Mich. 387, we held that the expectancy of life referred to in mortality tables is based upon the lives of healthy persons who are of the ages indicated; and in *Norris* v. *Railway,* 193 Mich. 578, we held that the improper admission of such tables was prejudicial error. However, the reduction of the verdict in the instant case from $25,000 to $7,000 cures the error which only affected the amount of the verdict.

On the question of abandonment, the trial court gave the following charge:

"If you find that Dr. Koch and Dr. Stiers promised to return to see Mr. Fortner after September 24th, and never did so, but abandoned him in his trouble, and damage resulted therefrom; and if you believe that such action is not in accordance with the usual and ordinary practice of physicians and surgeons in Detroit and similar localities, then you

may find that the defendant is liable for such, if any, damages as resulted proximately from such abandonment."

We find no error in this charge.

"A physician is not ·chargeable with neglect in allowing intervals to elapse between his visits, where the patient needs no attention during the intervals, but he is negligent in doing so where the attention is needed * * * the frequency of the visits is a question for the physician to determine, if he uses ordinary judgment." 48 C. J. p. 1130.

When a physician takes charge of a case and is employed to attend a patient, the relation of physician and patient continues until ended by the mutual consent of the parties, or' revoked by dismissal of the physician, or the physician determines that his services are no longer beneficial to the patient and then only upon giving to the patient a reasonable time in which to procure other medical attendance.

From an examination of the record we find that the evidence of abandonment is in dispute and that this question was properly left to the jury.

The next question relates to the duty of the defendant when he was called as an examining physician to attend plaintiff. The record discloses that defendant examined plaintiff manually, took his history, placed him on a diet for a week, and then injected a solution into his blood stream. The record also shows that when defendant made the manual examination, plaintiff had symptoms that would lead a physician to suspect cancer, syphilis, simple tumor, abscess, or tuberculosis. The usual practice among physicians and surgeons in Detroit in diagnosing the cause of a swelling such as was on plaintiff's knee when first examined by Dr. Koch

in June, 1931, was not only to take a history of the patient, but also have an X-ray made, a blood test taken and a biopsy made. The purpose of the X-ray is to give information of the condition of the bone. A Wasserman test would show the condition of the blood, if positive, it would indicate syphilis; while a biopsy is a test for the presence of cancer cells. These steps as above stated are not alternate steps in the diagnosis, but all must be done in order that the examining physician may arrive at the proper conclusion and prescribe the correct treatment. A physician or surgeon is bound to follow the usual and ordinary practice of physicians and surgeons of ordinary learning, judgment or skill in his own or similar localities. *Rogers* v. *Kee,* 171 Mich. 551.

In *Ramberg* v. *Morgan,* 209 Iowa, 474 (218 N. W. 492), it is said:

"The law is well settled that a patient who is treated by a physician is entitled to a thorough and careful examination, such as the condition of the patient and attending circumstances will permit, with such diligence and methods of diagnosis for discovering the nature of the ailment as are usually approved and practiced by medical men of ordinary or average learning, judgment, and skill in that community or similar localities."

It is the duty of a physician or surgeon in diagnosing a case to use due diligence in ascertaining all available facts and collecting data essential to a proper diagnosis. The instant case, not being an emergency and the defendant not having used such diligence in availing himself of various methods of diagnosis for discovering the nature of the ailment as are practiced by physicians and surgeons of skill and learning in the community in which he practiced,

he must be held liable for the damages due to his negligence.

We recognize the fact that if the general practice of medicine and surgery is to progress, there must be a certain amount of experimentation carried on; but such experiments must be done with the knowledge and consent of the patient or those responsible for him and must not vary too radically from the accepted method of procedure. One who claims to be a specialist insofar as diagnosing a case is concerned must also be held to the above rule.

The defendant requested the court to give the following instruction to the jury:

"You are instructed that you are to remove from your consideration the charge or claim that defendant Koch injected a harmful or poisonous drug into plaintiff's blood stream, for the reason that there is no evidence to support such a claim."

But, on the contrary, the court charged the jury as follows:

"It is claimed in the declaration—alleged in the declaration, and there has been some testimony tending to support the allegations of the declaration, that there was negligence on the part of the defendant in that he failed to exercise the reasonable degree of care and skill usually exercised by physicians and surgeons practicing in this and like localities; that he did not take proper X-rays for the purpose of making a proper diagnosis of the malady with which the plaintiff was afflicted; that he did not take specimens of the tissue of the affected area, and microscopically examine the same to determine the cause of trouble, and that *he did inject poisonous and harmful drugs into the blood stream of the*

*plaintiff*, and that the defendant did abandon the treatment of plaintiff without any cause whatsoever.''

A search of the record fails to disclose any evidence that the injection given to plaintiff by defendant was poisonous or harmful. We think the instruction requested should have been given.

''An instruction which assumes the existence of certain facts, or of evidence tending to prove them, when in fact there is no such evidence, is erroneous and should not be given.'' 64 C. J. p. 785.

The instruction given by the court erroneously assumed the existence of certain facts together with the failure to instruct as requested was prejudicial error; and its effect upon the minds of the jury, being impossible of determination, cannot be cured by the remittitur filed.

A new trial will be granted, with costs to defendant.

POTTER, C. J., and NELSON SHARPE, NORTH, FEAD, WIEST, BUTZEL, and BUSHNELL, JJ., concurred.